Council. We'll turn to the final case on this morning's docket, which is The Commonwealth of The Northern Mariana Islands v. The United States. Again, Council are welcome to begin whenever they're ready. Good morning. I'm Jay Livingstone, Attorney General on behalf of The Commonwealth of The Northern Mariana Islands. I'd like to reserve about five minutes for my brother. You may reserve the time, but you'll have to help us keep track. Will do. This is a unique case, in part because, or mostly because of the unique relationship that the CNMI has in the United States. CNMI, both parties have analogized the CNMI to states, to the relationship with Indian tribes, but neither one quite fits. With respect to states, when a state enters a union, the full range of the entire U.S. Constitution is applicable to the state, the full range of federal laws is applicable to the state. That's not the case with the CNMI. Only the specific sections made applicable to the Commonwealth through the covenant, the document that forms the relationship. Well, the covenant really deals with some exceptions as opposed to affirmative control, right? Because sovereignty is vested in the United States, for starters, right? So you have a sovereign who is controlling the conduct of law on the Mariana Islands, right? Yes. Okay. Except they can't deal with wage and hour and some other specific exceptions that are laid out in the covenant, one of which is not the submerged lands, right? Well, the covenant is broader than just wage and hour. Well, certainly it is. And if you came into court and said we had an agreement in which the Congress of the United States said the submerged lands as property are under the control of the Commonwealth, and the Commonwealth agreed to accept control of the lands, it would be out from under the covenant, right? Well, we say that the covenant does say that, that the covenant does include a reservation for... Exactly where? Section 801. Section 801 includes a transfer of all the real property held by the West Territory government to the people of the Northern Marianas. So you hinge everything on the meaning of real property. Yes. And you say that includes submerged lands as well as dry lands. Yes. And what's your best authority for that interpretation? Well, under federal law, submerged lands are a type of real property. Under the trust territory law at the time the covenant was negotiated, the trust territory held submerged lands as public lands, as real property, and the people of the Commonwealth have historically... Counsel, whose understanding of the term real property will govern the covenant? In other words, if CNMI has one understanding of what real property means under its traditions, and the states might have a different sense of what real property means under its traditions, whose sense of that is going to govern here? The people of the CNMI should govern. But if it's an agreement between two parties, why does one party's understanding necessarily govern? Well, at a minimum, both parties' understanding should be taken into account. But here, it's really the unique situation of the negotiations. Well, Congress was prepared to give a three-mile limit, as it has done with the states, and the Commonwealth rejected it, right? The proposal of the United States was different than what the states have. It had a series of reservations of rights by the United States that don't exist in the transfers to any of the states. And the Congress, that law wasn't passed. The CNMI did oppose the passage of that law. The CNMI doesn't have any representation in Congress. So it's been the position of the Marianas that whatever the covenant says, that's going to be the controlling document, right? Yes. Okay. And you're out from under trusteeship now, right? Yes. Okay. But at the time – well, that ties into what I was saying a second ago. At the time the document was negotiated, the people of the CNMI were under trusteeship. The United States was under trusteeship. But it also went to a popular vote that was overwhelmingly approved by the constituency of the Commonwealth, right? That's correct. And the Congress approved it and was ratified as an act of Congress, right? That's correct. Okay. At the time of the negotiations, it was a trustee-beneficiary relation. The United States was a trustee. The people of the CNMI were the beneficiaries of the trustee. That created – put on the United States obligations of any trustee. And the law of trust – But the trust is terminated. So any terms of the trust are no longer applicable, right? The – We're not – the United States is the sovereign, and it is not answerable to the United Nations for its relationship with the Commonwealth. Is that a fair statement? The United States acted as a trustee solely under the auspices of the United Nations at the end of World War II. Well, the United States does have trust obligations. And the United – those trust obligations have been recognized in other contexts, such as with respect to Indian tribes. And – Indian tribes in the United States, within the continental United States, have incidents of sovereignty. The sovereign in this case is the United States, not the Commonwealth. That's the agreement of the Covenant. But at the time the Covenant was negotiated, the people of the CNMI were sovereign. And they – but they knew what was in the Covenant, and it was submitted to them, and overwhelmingly it was approved as a substitute for the management of the body politics, best way to put it, as a Commonwealth. And Commonwealth is a term that the negotiators picked. I don't know why they didn't put a territory like they did with the states, but they – or treat it like they treated Guam. If they want to call it a Commonwealth, that's fine. That's what they call it. And – but the Covenant specifically says the sovereignty is in the United States, and the laws and constitution of the United States apply, with certain exceptions. And land is not one of them. But what the Covenant does say is that all real property is transferred. Okay. All the real property held by the trust territory. If that is an ambiguous term, which it seems to be, because there are certainly some instances in which real property can include submerged lands, for example under the Quiet Title Act, and other places it means dry land. So let's assume it's ambiguous. What rules of construction apply in this particular context? Isn't there a presumption in favor of the sovereign? Because of the peculiarities of this case, I don't believe so. The trust-benefactor relationship places on the trustee a heavy burden to show that the beneficiary is making a knowing transfer. The United States has that burden as the trustee. The Covenant was negotiated at the time that that relationship exists. That relationship doesn't exist today. But the people still get the benefits of the relationship. Because the negotiation occurred while they were in that submissive status. Yes. And so that places on the United States a heavy burden to show that the people of the Sinai were making a knowing transfer. So we have really two conflicting presumptions. The presumption of paramountcy of the sovereign and the presumption of taking care of a beneficiary. So we have the dueling presumptions. And how do we decide between those as to who wins? I know you want your client to win, but on what principle basis do we choose between those presumptions? Well, looking at the history of the adoption of the Covenant, the floor leader at the time, Congressman Burton, indicated that all ambiguities of the Covenant should be read in favor of the people. I think he was recognizing the trustee-beneficiary relationship. And so he was a congressman. He was the sponsor of the Covenant. But his views on that surely are not the views of the Congress. That wasn't voted upon. If we wanted to include language that said all presumptions will run in favor of the Commonwealth, we would have included that. That's a fairly weak read, isn't it, to have one statement on the floor of one house of Congress? Well, I believe the Supreme Court has said that one floor leader, one floor manager such as Congressman Burton, making a statement like that is significant. We don't even know if there was anybody even in the chamber at the time. It's unclear when he made the statement. It's submitted in the congressional record after the vote. But it's unclear whether that was. It's possible that nobody else even heard him, and it was put in the congressional record after they took the vote. Yeah, it's not clear when he made the statement. It doesn't sound terribly helpful. But it is significant, according to the Supreme Court. But in the case of Indian tribes, the presumption generally favored in the United States has been reversed because of the special circumstances of the way the Indian tribe treaties were negotiated. And that is it wasn't considered at arm's length. In those cases, it was because the United States was forcing the Indian tribe to sign a treaty, and that caused a reversal of presumption. And that's not true here. That's not true here. But the same reasoning applies in that there's the same— it's not a complete arm's length transaction because of the trustee-beneficiary relationship. If this was so important to the Commonwealth, why didn't it provide for the specific transfer by legal description? I mean, that's the way everybody, at least in this country, deals with the validity of a deed. Is the property specifically described by meets and bounds or area or square miles or whatever it is, monuments? There's none of that in the covenant. I'm not sure why, but I think one of the reasons that the covenant negotiators on the Commonwealth side were probably comfortable is because of how broad 801 is. It's all real property held by the trustee-beneficiary government. Mr. Livingstone, the United States has assumed the obligation of defending the Marianas. Isn't that correct? Yes. And the Northern Marianas does not maintain its own navy. That's correct. Okay. So the United States comes into this covenant assuming an obligation to defend a new territory, a Commonwealth. And the United States negotiates this against the background of a series of Supreme Court cases by states asserting a title to submerged lands, in which the Supreme Court of the United States upholds the claims of the United States on the basis that the U.S. has assumed the responsibility of national defense and that therefore the states cannot claim those submerged lands except what Congress specifically gives back to them. Why, when the United States is assuming that kind of obligation, shouldn't the United States be able to rely on the idea that it's going to have to control the waters around the Northern Marianas in order to be an effective defender of those waters? Well, in the covenant, national defense was discussed at length in negotiations. And the United States, and the covenant is specific, that yes, national defense is given to the United States, not to the CMI. But the United States, the people of the CMI were very worried about the real property interest that the United States was going to take. And so in the property section of the covenant, they specifically delineated what the United States was going to get for national defense. And they gave an entire island in the chain to the United States. They gave two-thirds of another island to the United States. This is the lease of the military establishment. Of the military establishment. Yeah, in parts of the harbor, and then other land on site, and in parts of the harbor continuing on all three locations. And then in another section it says that those three sets of property that are listed, specifically how much and where, that's it for national defense. That's all the United States needs for defense needs. If it needs more in the future. But doesn't that merely suggest that the United States would have continuing rights to occupy those four very, very specific needs, not for purposes of national defense. It doesn't relieve the United States of obligations to defend other islands, even if we don't have establishments there. But what it really did was preserve the claims of the United States against the time when Congress might give back to the Northern Marianas a three-mile stretch, as it had done with other states. In other words, it is an anticipated reservation of property for military installations against a general three-mile return, as Congress had done with all of the other states. The negotiations appear inconsistent with that, in that it's very specific in what's reserved for defense and what's not. Plus, with respect to the state. Well, is it your position that if a fleet of fishing vessels went out after some fish in the Pacific were attacked by a foreign nation, that there's no obligation for the United States to reply and respond to the call for help in defense of a fishing fleet? No. And even under the CNMI statutes... Within 200 miles of islands, if this happens, still an obligation to defend, right? Yes. Beyond that, maybe no, right? Right. Okay. But even under the CNMI statutes, where it sets out its claims of ownership of submerged lands, it makes clear that it doesn't do anything to infringe upon the national security interests. The United States... The CNMI could never stop a U.S. fleet from sailing into one of its harbors. And, in fact, the Navy regularly visits the CNMI. But... And that's consistent with what the states have. Let me ask you one more thing about analogies, because we've talked about analogies to the states, we've talked about analogies to Indian tribes, we've talked about the trust relationship. Do you think there's a parallel between the United States' relationship to CNMI and its relationship to Puerto Rico? And, if so, what effect should we give to the difference in the two? That is, with respect to Puerto Rico, there's an explicit grant of authority over the submerged lands for three miles out or three leagues out or however those things are measured. And with respect to CNMI, there is not. So is there a parallel? What effect do we give to the distinction? There is a parallel to an extent. I mean, the CNMI truly has a unique relationship with the federal government. Puerto Rico doesn't have a covenant that's mutually binding. It has a statute that can be changed. Just a statute under 48 U.S.C., whatever it is. Yeah, it can be changed by Congress at will. The covenant is binding on the United States as it's binding on the CNMI. Neither party can change it without the consent of the other party. And that is a unique relationship. And the provisions of the covenant are unique. And so the CNMI really has a different relationship than Puerto Rico does. So I'm not sure what distinction can be drawn. But it's really, going back, I mean, the people of the CNMI understood that they were getting all the real property from the trust territory, and that included submerged lands. And for national defense, the states all have some amount of ocean ownership. Most states have three miles. A few states have nine miles. Montana doesn't have any. What's that? Montana doesn't have any. All the coast states. But all by specific grant from Congress. That's true. Which is an offer to the Northern Marianas, of which the Northern Marianas to this point have rejected. Well, different terms in the states. But none of those statutes, no one's ever accused California of infringing on national defense by owning three miles of ocean. And the same is true of the CNMI. The CNMI can have ownership rights. But that won't infringe on the national defense. It won't infringe on the United States' ability to sail its navy through and defend the CNMI. Ownership is different. I'm curious, Hunter. What's really at issue behind this? Is this oil and gas? What's at issue behind the ownership of the submerged lands here? Well, people believe there are resources out there, but no one has extracted anything beyond fish. But it's really the identity of the people of the CNMI. Today there are several people from the Northern Mariana, from the Saipan. Are there any southern vessels out there from World War II combat? I don't believe there were naval battles. I don't think the Japanese was there. There were several land battles. Any maritime shipping that has valuable cargo that is not found or discovered, treasure of one kind or another? Not yet. No one's really exploited. There hasn't been a row over any of that yet. Nobody's done any looking yet. But it's really the identity of the people of the CNMI. When I talk to people in the CNMI, it astounds them that the ocean that connects their islands. I mean, you can see two of the islands from Saipan where I live, and it's just baffling to anyone that that is home. For as long as people have lived in the CNMI, they have viewed it as the extension of the land, and people have claimed ownership as far as out as 200 miles. Is there a political culture within the Commonwealth that just says, look, the United States has done this to us, and they've taken these submerged lands, and these are very important to us, and maybe it's now time to mutually agree to dissolve the covenant, and each of us will go our own way and take care of our own defense and our own international affairs and our own currency and drug crimes and all the material stuff the United States does supply in terms of government? I'm sure there are some people in the CNMI that have that view. I think generally that's not the view of the government, the people of the CNMI. So they're, for the most part, the populace of the Commonwealth. They're quite satisfied with the arrangement with the government, the United States government, and the way it works, right? Yes, but I would say I've never talked to anyone in the CNMI who hasn't shown total disbelief that this case is still proceeding and that the United States is making a claim for its waters. I mean, and people typically say my waters, our waters. Well, yeah, and at bottom that sort of runs contrary to the sovereignty statement of the covenant. You know, I put up with a lot of things in the United States government. You won't believe it, but I'm not always happy with what they do in Congress either in one regard or another, but I don't want to leave this country. I don't want to change the form of government of this country. I'll just continue to live my life and work around it the best I can, and I think that's exactly what should be going on in the Marianas Island. If they want the benefits that are there and available under the covenant, then they pay the price. I think generally people in the CNMI are happy with the United States relation, but it's with the understanding that they retain submerged lands because of 801, that 801 transferred all the real property, and they got all the real property. Thank you, Counselor. Although you've exceeded your time, we used quite a bit of it, and we'll restore two minutes for rebuttal when the time comes. Appreciate it. Thank you. May it please the Court, I am David Shilton from the Department of Justice representing the United States. We think the district court properly rejected the Commonwealth's request in this case to be treated as having essentially the same rights to submerged lands offshore as an independent nation would, that is, rights beginning at the low water market extending out 200 miles. The Commonwealth's claim is inconsistent with its political status vis-à-vis the United States, which is established by the covenant. The covenant provides in section 101 that the Commonwealth will be, quote, under the sovereignty of the United States of America. I think that the crux of the claim seems to be that the term real property, as it was understood at the time, includes not only dry land but also submerged land. And, of course, the United States could have granted rights to the submerged lands had it chosen to do so in this negotiation. So isn't the real question interpreting what the covenant actually did? That is the real question, and I think you asked earlier about analogies, and I think a good one to answer your question is just two years before the covenant went into effect, Congress passed the Territorial Submerged Lands Act, which included Guam. Guam is very close to the northern Marianas Islands. You'll notice in the covenant that Guam is mentioned again and again. And in Guam there had been a solicitor's opinion back in the 1950s, which laid out that under the Supreme Court paramouncy cases that the United States, as sovereign, held title to the submerged lands beyond the low water mark. So in 1974, Congress passed this Territorial Submerged Lands Act and granted Guam three miles. And in the legislative history, it explains about the solicitor's opinion and why a grant was needed because the United States was sovereign. So I think at that time it was generally understood that if the United States was going to obtain sovereignty, that part of that package would be ownership of submerged lands. Now, with respect to Guam, was there anything like Section 801 of the covenant that otherwise granted real property? In other words, was there a background distinction for the enactment of the Territorial Submerged Lands Act? I believe there was. Guam got the transfer of public lands that had formerly been held by actually the Navy in that case. So I think Section 801 is like that. It was a transfer of public lands that had formerly been held by the old trust territory government. These were public lands, onshore, there were public buildings and so forth that needed to be transferred to the new government. And so that's what Section 801 is about. And under federal law, which is applicable here, in order to transfer submerged lands, you have to be clear. Now, normally when we have contracts between private parties and one party has a different understanding of an essential term than another, we sometimes say there's been no meeting of the minds. If we were to conclude that here, what would be the result? In other words, if the then-trust, the Mariana Islands, had one view of what real property was being conveyed and the United States had a different view, what would we do with that? Well, if that were the case, and I don't really agree if it was, but if it were, I think it's a little different than a contract. This is the essential document setting up the political relationship between the United States and the Commonwealth. It was approved by Congress. So I think it would be, you have to interpret it more like you would a federal statute. And as such, the intent of individuals involved in the drafting really is not what governs. I think what has to govern is the essential principles that have been used for decades to interpret statutes as they may or may not grant submerged lands. So I think those principles which the Supreme Court has established about submerged lands, that there has to be a clear and unequivocal grant in order to separate ownership from sovereignty, are the ones that have to govern. But I don't think it's really an ambiguous matter anyway. I think Section 101 and 104 of the covenant are absolutely unambiguous that all external sovereignty is in the United States and that that really concludes the matter. Secondly, I think even if you did look to the intent of the grafters of the covenant, that you would find that actually both parties understood that for the Commonwealth to obtain submerged lands, it would have to be from a grant by Congress. You will see references to the Commonwealth's future authority over submerged lands, but that is because it was assumed by all parties that Congress would treat the Commonwealth as it had the states and other territories. And I think probably the best instance of that is the Constitution of the Northern Marianas Islands, which was enacted in 1978, just two years after shortly after the covenant. And that Constitution makes a clear distinction between different kinds of lands. It has four categories of public lands, and it is the fourth one that are public lands that refers to submerged lands that will accrue to the Commonwealth pursuant to United States law. And if you go to the constitutional analysis of the grafters... Well, wait a minute. It doesn't actually say as United States law. It says the management and disposition of submerged lands off the coast of the Commonwealth shall be as provided by law. Now, does that mean CNMI law, or does that mean federal law? I believe it means federal law, because if you look at the constitutional analysis, it talks about the Paramount C cases specifically, and talks about how they are hinged on the United States sovereignty and defense powers. It talks about how in section 101 and 104 of the covenant, those powers are in the United States. And accordingly, the Commonwealth will have the rights to submerged lands that are granted by Congress. So I think it was understood at the time that those submerged lands would have to be granted by Congress, and that the Commonwealth would have authority over them. And I don't think that... The report on the Constitution, of course, is pretty difficult, I think, for CNMI to deal with, because it does suggest that there were some people who... within a very short time after the covenant that believed that the submerged lands issue was open and that Congress would probably have to deal with it. But how does that help us understand what impact does an after-acquired document, even a constitutional document, especially a commentary on a constitutional document, have for construing the covenant? Well, I think it shows just the general understanding of high officials in the Commonwealth around the time of the covenant drafting. True, it's after, but I think the striking thing is that prior to the covenant, in the history of the covenant drafting, there's just no references to submerged lands at all. So this is about all we have to show people actually focusing on the question of submerged lands. So I think it was... Let's suppose that the term disappeared to have not been negotiated. And let's suppose that everybody on the CNMI side, at the time that we were signing the covenant, was thinking, well, of course we've got the ocean. And everybody on the U.S. side of the table was thinking, well, of course it belongs to us. Given the U.S.'s position as trustee, who gets the presumption there? Well, I think the presumption is the same as it is with the states. And let me point to the United States versus Texas case, I think, demonstrates that the state of Texas, before it joined the Union, had authority and title over three marine fleets. And it asserted, in the United States versus Texas case, that the understanding of everyone in Texas was that they would continue to have that. And the Supreme Court said that's really irrelevant, that we're deciding this case basically on constitutional principles of having to do with the necessity for national defense that the federal sovereign have title to the undersea waters. But the Supreme Court has never decided that in the context of a party to whom the United States separately owes a fiduciary duty. In other words, at least as I read it, we didn't owe a fiduciary duty to Texans at the time. Yes, that's right. Whereas here, that is the fact. And I think what both Judge Bybee and I are trying to explore is whether that makes any difference in what we do with what I referred to earlier as the dueling presumptions, the one created by the United States versus Texas and the other similar cases, and the one created by the trust relationship that existed up until the moment that the covenant was signed. Well, this court has decided two cases in that context, that is Village of Gamble versus Hodel and Native Village of Eak versus Trawler Diane Marie. These are cases brought by Native Alaskans with whom there is a trust relationship. And nevertheless, despite that trust relationship, this court held that the doctrine of the Paramount Sea cases fully applied. But wasn't that in the context of the claim of aboriginal title, which is slightly different than the context of two people reading the same document that they both intend to sign, but they have different understandings of that document? Well, I would think if anything, the claim in the Native Village cases for a different type of reading would be stronger than it is here because of the well-established longtime doctrine of trust relationship and reading in favor of natives that obtains in that area. Here, while the U.N. set up a trusteeship, it's not really quite the same thing as the trust relationship with Native Americans. It's really a trusteeship to make sure that the United States brings along the people of the CNMI to self-government. It's really a governmental trust in a way, and it allows the people of the Commonwealth to make a choice to either go with free association or they'd be independent or be under the sovereignty of the United States. And the fact that they made a choice that involves certain benefits but also giving up certain things doesn't mean that by giving up those things that that somehow goes against the trust. In other words, the Commonwealth cannot conduct its own foreign policy. It cannot sit on international bodies, but just because it lost those doesn't mean that that was somehow violating the trust. And so I think the decision to proceed under the sovereignty of the United States and along with that, don't get submerged lands, that's just well established that that package doesn't go against the trust in a way that loss of lands for an Indian tribe would be viewed as a breach of trust. So I just think the analogy does break down when applied to the Commonwealth, but even if they were in the same situation as Indian tribes or Native villages, that this court's decisions in EAC and Gambell show that the paramount rule of the Supreme Court cases is so strong. Counsel, isn't your analogy a fallacious one in that Secretary of State Seward just went to Russia and bought Alaska? I mean, we acquired Alaska by purchase. We're not acquiring anything except by mutual agreement of the parties, and that's evidenced by the covenant. The trusteeship and the fiduciary aspects in this case all preceded because of the historic facts of World War II and who occupied what lands and then the relationship of the United Nations as an international body settling the problems that were created by World War II. And the United States agreed voluntarily under certain terms and conditions expressed in the covenant to interfere in the affairs of what's now called the Commonwealth. Why does the prior history not merge into the voluntary mutual agreement of the parties? And that's as far as we need look. That's different than going out and buying Alaska. There certainly are differences. I think my point was just generally that the Supreme Court has applied the paramount doctrine and the strong presumption, and this court have applied it in just a real large variety of cases. I think if you didn't have the paramount doctrine, you'd have a very, very tough road to hoe in this case. It would be a different case, no doubt about it, but the paramount doctrine has been continually reaffirmed by the Supreme Court and by this court and I think has to apply here where the covenant so specifically grants all external sovereignty to the United States. So I think that is the background principle against which this agreement was negotiated and the background principle under which the district court correctly decided that the submerged lands remain with the United States and that it is up to Congress to decide the extent to which submerged lands will be granted to the Commonwealth. I think the question came up with regard to Section 802 of the Commonwealth and that's the leasing provision and I think there's just a number of reasons why that in no way evidenced the concession that the Commonwealth would receive submerged lands. First of all, it simply talks about waters immediately adjacent to the leased lands on shores. I think that logically refers to internal waters which the Commonwealth did get and also waters between the high and low water mark. And even if it could be read more broadly than that, I just don't think that it could have easily been talking about the period before the United States obtained full sovereignty, which was in 1986. So I don't think that cuts against the argument at all. Unless there are other questions. I think not. Thank you, counsel. Thank you. Mr. Livingstone, we'll give you two minutes for rebuttal. The important thing about the trust relationship isn't that the CNMI couldn't have done this. The CNMI could do it, could transfer submerged lands to the United States. It's the United States' burden to show that the people knew that they were doing it. They haven't even attempted to meet that burden. There's no evidence in the record that the people who voted on the covenant knew that that was the action they were taking. The government points to sections 101 and 104 of the covenant, and those sections are clear with respect to sovereignty and national defense. There's no mention of transfer of submerged lands. There's no indication that the people would have had reading that document that they were giving up submerged lands. For the Constitution of the Northern Marianas, there are two sections that were discussed that deal with submerged lands. I'll deal with them in reverse order. Article 11, Section 2 says the management and disposition of submerged lands will be provided by law. That refers to common law, not the United States law. At the time the Constitution was proposed by the people, they created Marianas Public Land Corporation to deal with the dry lands, but the people were undecided on how to deal, what government agency should be created to deal with submerged lands. The first or second legislature of the scene of mine created another department to deal with submerged lands. And the article, Section 2, was just telling the legislature of the scene of mine to create an agency to deal with submerged lands. Section 1, that's the general listing of what public lands the scene of mine holds. It lists all the public lands under Section 801 of the Covenant. The two secretarial orders that were issued in the 70s, 2989 and 2069 dealing. And then it also says all submerged lands provided under U.S. law or something along those lines. Those sections aren't conceding, it isn't a concession by the scene of mine that submerged lands had to come from a federal law. It's simply an acknowledgment. They wanted to be as broad as possible in all the possible ways to get public lands. And if you look at it just from the perspective of dry lands, it shows how each provision is meant to be overlapping of the others. The 801 and the two secretarial orders are all basically matching the amount of dry lands at least. I think the United States would agree on that, that the scene was getting. There would be no reason to list the three orders if the scene of mine was getting dry lands under just one. The fourth article about submerged lands should be looked at in the same context. It's just all the dry lands and submerged lands the scene of mine got under 801, all the dry lands and submerged lands the scene of mine got under the two secretarial orders. And then if they get any more submerged lands, assuming the United States is right and submerged lands didn't get transferred in any one of those three documents and Congress provides for it, or that Congress provides an additional line. The regime of submerged lands was changing at that time. If they only got three miles of submerged lands and Congress passed a law that got six more, that would have been an additional reason. And I think the Constitution has to be looked at in that context. Thank you, Counsel. Thank you. We appreciate very much the arguments of both parties. They've been extremely helpful and interesting. The case just argued is submitted. And for this morning's session we stand adjourned. All rise.
judges: Beezer, Graber, Bybee